UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Index No. 16 CV 01925(LTS)

CAPITOL PEDICABS, LLC, and BOURAMA CAMERA

                      Plaintiff,

—against—

THE CITY OF NEW YORK, MAYOR WILLIAM DE BLASIO, in his official and individual capacities, THE DEPARTMENT OF CONSUMER AFFAIRS, DEPARTMENT OF CONSUMER AFFAIRS COMMISSIONER JULIE MENIN, in her official and individual capacities, THE NEW YORK CITY PARKS DEPARTMENT, NEW YORK CITY PARKS DEPARTMENT COMMISSIONER MITCHELL SILVER, in his individual and official capacities, THE NEW YORK POLICE DEPARTMENT, NEW YORK POLICE DEPARTMENT COMMISSIONER WILLIAM BRATTON, in his official and individual capacities, DCA INSPECTOR ALEXANDER GERSHKOVICH, and POLICE or PARKS ENFORCEMENT OFFICERS and/or DCA INSPECTORS JOHN DOES and JANE DOES in their individual capacities,

                      Defendants.

COMPLAINT

DEMAND FOR JURY TRIAL

## PRELIMINARY STATEMENT

1. This is a civil rights action brought by Plaintiff, CAPITOL PEDICABS, LLC, and BOURAMA CAMERA to seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

1

2. The Defendants, The City Of New York, Mayor William De Blasio, The Department Of Consumer Affairs, Department Of Consumer Affairs Commissioner Julie Menin, The New York City Parks Department, New York City Parks Department Commissioner Mitchell Silver, The New York Police Department, New York Police Department Commissioner William Bratton, and Police or Parks Enforcement and/or DCA Officers John Does and Jane Does have implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutionally stopping and issuing violations to licensed pedicab drivers and licensed pedicab businesses by the New York City Department of Consumer Affairs ("DCA"), The New York City Parks Department Parks Enforcement Officers ("PE"), and the New York Police Department ("NYPD").

3. Without the reasonable articulable suspicion required under the Fourth Amendment, DCA, PE, and NYPD officers ("Officers") have been, and are engaged in, rampant stops and ticketing of individual pedicab drivers and issuing tickets to pedicab businesses, including Plaintiffs. Officers, in violation of the Equal Protection Clause of the Fourteenth Amendment, often have used, and continue to use Officers' discretion rather than a uniform procedure or objective standard as the determinative factors in deciding to stop and ticket pedicab drivers. This method of stopping drivers is gratuitous, individually discriminatory, and ripe for abuse.

4. The Officers' constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and enforced by the City, Mayor and Commissioners of the NYPD,

DCA, and Parks Enforcement. The City, Mayor and Commissioners of the NYPD, DCA, and Parks Enforcement have acted with deliberate indifference to the constitutional rights of the pedicab drivers and pedicab business owners by: (a) failing to properly screen, train, and supervise Officers, (b) inadequately monitoring Officers and their practices in stopping and ticketing pedicab drivers, (c) failing to sufficiently discipline Officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the Officers' unconstitutional practices.

5. Upon information and belief, in 2005, city officials were attempting to ban all Pedicabs in NYC.

6. Upon information and belief, city officials were claiming that the ban is necessary because the streets are "congested" and "Pedicabs are creating hazardous conditions in high traffic areas."

7. Upon information and belief, city officials were not successful in their attempt to ban all pedicabs in New York City because their attempts were unpopular.

8. Upon information and belief, until 2007 Pedicabs were not specifically regulated by the city.

9. Upon information and belief, in 2007 city officials passed regulations and standards for Pedicabs. The regulations required, among other things, that pedicabs be operated only with a license issued by the Department of Consumer Affairs, that violations of the regulations would be punished by steeply increasing fines, and that

upon issuance of three outstanding fines to a driver or owner, the licenses for all of the owner's pedicabs would be suspended.

10. Upon information and belief, the city began enforcing regulations against Pedicabs drivers and owners.

11. Upon information and belief, upon the initial issuance of the licenses by the DCA, the value of a licensed pedicab increased dramatically, due to limited supply, and Plaintiffs, among others, invested heavily in acquiring licenses to operate.

12. Upon information and belief, beginning in 2011, the City, and the DCA in particular, were facing budget shortfalls. The DCA responded by hiring 14 additional inspectors to issue more fines and tickets. The additional revenue was projected as $1.6 million per year.

13. Upon information and belief, DCA issued a record 24,176 tickets, and DCA revenue from fines increased to $14 million in 2012.

14. Many of these tickets were the result of a targeted ticketing campaign against drivers and owners of pedicabs.

15. Upon information and belief, the city was not successful in attempting to ban the Pedicabs, and thus began to excessively and illegally ticket Pedicab drivers and owners in an effort to discontinue Pedicabs from operating.

16. Upon information and belief, the city was not successful in excessively regulating Pedicabs, and thus began to excessively and illegally ticket Pedicab drivers and owners in an effort to discontinue Pedicabs from operating.

17. As a direct and proximate result of defendants' policies, practices and/or customs, pedicab drivers have been subjected to unconstitutional stops, seizures of property, fines for dubious charges, loss of licensure, and loss of business and income.

18. Additionally, because of the risk of suspension of all licenses due to the issuance of excessive fines, the Plaintiff's previously valuable pedicab licenses have become essentially worthless.

19. As a direct and proximate result of defendants' policies, practices and/or customs, pedicab owners have been subjected to unconstitutional stops, seizures of property, fines for dubious charges, loss of licensure, loss of business and income, as well as loss of value of their pedicabs and licenses, their most important assets.

20. Plaintiffs seek injunctive and declaratory relief that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments and an injunction enjoining defendants from continuing such policies, practices and for customs. In addition, Plaintiffs seek compensatory and punitive damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION

21. Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

22. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

23. Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

VENUE

24. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) and (c).

JURY DEMAND

25. Plaintiffs demand trial by jury in this action on each and every one of their claims.

PARTIES

**Plaintiffs**

26. Plaintiff Capitol Pedicabs, LLC ("Capitol"), is a Foreign Limited Liability Company formed under the laws of the District of Columbia, authorized to do business in New York. Capitol owns licenses for 30 pedicabs. Pedicabs that Capitol owns have been subject to frequent stops and ticketing, causing loss of business. Capitol is only able to run about half of the pedicabs for which it owns licenses because of the unconstitutional and excessive enforcement actions by the Defendants. The value of the licenses and the pedicabs themselves has also been severely reduced.

27. Plaintiff, Bourama Camera was a pedicab driver for eight years. He was stopped and ticketed more times than he can accurately recall, and was recently forced to stop driving pedicabs because the stops and fines made it impossible to earn a living doing so.

**Defendants**

28. Defendant CITY OF NEW YORK ("City") is a municipal entity created and authorized under the laws of the State of New York. The City has established various agencies and departments which perform law enforcement functions as agent for the City, and for which, the City is responsible. The City assumes the risks incidental to the maintenance of law enforcement agencies and the employment of law enforcement officers. The DCA, PE, and NYPD's operations include the operations as described herein.

29. MAYOR WILLIAM DE BLASIO, is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the DCA, PE, and NYPD. He is sued in both his individual and official capacities.

30. The DCA is a municipal agency of the City charged with a variety of functions, including granting and policing business licenses. The DCA issues pedicab licenses, and DCA inspectors write tickets and impose fines on pedicab drivers.

31. Department of Consumer Affairs Commissioner JULIE MENIN, is and was, at all times relevant herein, the DCA Commissioner for the City, and is and was

responsible for, and the chief architect of, the policies, practices and/or customs of the DCA, a municipal agency of the City. She is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the DCA inspectors under her command who are or were employed by the DCA, including the Defendants named herein. She is sued individually and in her official capacity.

32. THE NEW YORK CITY PARKS DEPARTMENT, is a municipal agency of the City charged with maintaining the City's parks, and ensuring their safety. The Parks Department employs Parks Enforcement Officers, who write tickets and impose fines on pedicab drivers.

33. New York City Parks Department Commissioner MITCHELL SILVER, is and was, at all times relevant herein, the Parks Commissioner for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the Parks Department, a municipal agency of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the Parks Enforcement officers under his command who are or were employed by the Parks Department, including the Defendants named herein. He is sued individually and in his official capacity.

34. THE NEW YORK POLICE DEPARTMENT, is a municipal agency of the City charged with operating a police force. The NYPD employs police officers, who write tickets and impose fines on pedicab drivers.

35. New York Police Department Commissioner WILLIAM BRATTON, is and was, at all times relevant herein, the Police Commissioner for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the NYPD, a municipal agency of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including tile Defendants named herein. He is sued individually and in his official capacity.

36. Upon information and belief, ALEXANDER GERSHKOVICH is and was, at all times relevant herein, associate inspector with the DCA. Inspector Gershkovich wrote TK tickets against Capitol and TK. TK of the tickets were dismissed for violation of Capitol and TK's 4th and 14th Amendment rights under the constitution. Inspector Gershkovich is sued in his individual capacity.

37. POLICE or PARKS ENFORCEMENT OFFICERS and/or DCA INSPECTORS JOHN DOES and JANE DOES are employees of the City, who in their capacity as law enforcement agents of the City, carried out the City's policies relating to the stopping and ticketing of pedicabs.

38. Upon information and belief, beginning in 2011, the City, and the DCA in particular, were facing budget shortfalls. The DCA responded by hiring 14 additional inspectors to issue more fines and tickets. The additional revenue was projected as $1.6 million per year.

39. Upon information and belief, DCA issued a record 24,176 tickets, and DCA revenue from fines increased to $14 million in 2012.

## **The Defendant City Of New York Has Pursued A Policy Of Harassing Pedicab Drivers And Owners In Violation Of Their Constitutional Rights**

40. Plaintiff repeats and realleges all allegations in paragraphs 1 through 38 as if set forth in full herein.

41. The Defendants, acting under color of regulation, policy, custom, and usage, beginning in 2012 engaged and continue to engage in a program of arbitrary and capricious stops and seizures without probable cause, and in a manner that violated and continues to violate the rights of the Plaintiffs under the 4th and 14th Amendments of the Constitution of the United States.

42. This conduct is a direct and proximate result of the Defendant City of New York's policies, practices, and customs because the Defendant City of New York has encouraged and sanctioned the practice of stopping and seizing pedicabs without reasonable suspicion or probable cause to do so.

43. The Defendant City of New York and its agencies have failed to train its law enforcement officers in the NYPD, Parks Enforcement, and DCA, and has failed to supervise and monitor their performance of stops in a way that passes constitutional muster.

44. On at least on occasion, a ticket issued by the Defendants and their agents to the Plaintiffs have been dismissed by an administrative law judge on grounds of constitutional insufficiency.

45. Regarding Violation No. 05319579, issued by Defendant Gershkovich on September 14, 2013, Inspector Gershkovich admitted to the administrative law judge that he was instructed by his supervisor to "stop all pedicabs."

46. As such instruction was impossible to follow due to the number of pedicabs in the inspector's assigned area, and no formal policy was implemented. The inspector stopped Plaintiff's pedicab based on his own discretion, not pursuant to a uniform procedure, objective standard, or reasonable suspicion.

47. Inspector Gershkovich stopped Plaintiff Camera without reasonable suspicion, based only on his arbitrary discretion.

48. On numerous occasions, as recently as 2015, New York City officials have been videotaped conducting mass stops of pedicab drivers, and such stops are still ongoing.

49. Upon information and belief, these stops were conducted without a plan devised by a superior embodying neutral limitations on the conduct of police—that the command from above was the informal and impossible instruction to "stop all pedicabs."

## **Arbitrary and Capricious Regulation of Pedicabs Violates New York State Law**

50. The regulations, as implemented are arbitrary and capricious, and should be struck down.

51. The regulation of the pedicabs as applied goes beyond the safety of the customers, drivers, and public, and merely aims to extract money from a regulated industry.

52. The suspension of pedicab licenses based on "three or more violations" leaves too much discretion in the hands of the officials on a case-by-case basis, is vague as to what triggers suspension, and can be triggered by such *de minimis* violations as not issuing a receipt to a customer.

53. The regulations, both as enacted and implemented are far harsher than for automobile taxicabs, despite the greater danger posed by a gasoline-powered engine in a heavy car compared to a tricycle powered by human muscles.

**The Plaintiffs Have Been Damaged Financially By The Defendants' Actions**

54. Plaintiff Capitol has been forced to take half of their thirty pedicabs out of service due to the continuous searches conducted by law enforcement officers.

55. The continuous inspections by law enforcement officers have caused many pedicab drivers, including Plaintiff Camera, who lease pedicabs from Plaintiff Capitol to switch to a different job because they were constantly losing customers and time while being detained for lengthy inspections, usually lasting for over an hour.

56. Capitol cannot operate a full capacity because drivers, including Plaintiff Camera, are fleeing the industry.

57. In addition, it is a serious risk for a fleet of thirty pedicabs to operate on the streets of New York City because the more pedicabs that are on the street, the more likely a company is to be inspected, fined, and suspended.

58. The inspections and the issuance of violations created such uncertainty that the value of the Plaintiffs' business is severely damaged.

59. After Plaintiff Capitol received two violations during inspections on September 6, 2013 and September 14, 2013, they began communicating with other pedicab businesses during weekly meetings, and learned that other pedicab businesses were forced to pay $4,000 and $8,000 penalties, and that some companies had their pedicab business license revoked and registration plates voided after receiving third and fourth violations.

60. Based on what happened to other pedicab companies in 2012, it did not make good business sense to put Capitol's entire pedicab fleet at risk—the threat of a $4,000 or $8,000 penalty, pedicab business license revocation, and irrevocable loss of the thirty registration plates was too great a risk.

61. The inspection and ticketing also lead to administrative burdens and legal expenses: Plaintiff's hearings were adjourned three times, when on November 20, 2013, Capitol decided to take half our fleet off the street until they knew whether one or more of the two violations would be dismissed.

62. Going to hearings to fight unfair charges and tickets ends up costing as much in legal fees as paying the violation.

63. For example, Capitol received a violation on May 25, 2013, DCA v. Capitol Pedicabs, LL5317487. Eventually, the Department withdrew the charges on July 25, 2013, but not before Capitol incurred a substantial bill for attorney's fees for two court appearances, discovery requests, and consultation with the Department.

64. In one case, Capitol's attorney appeared in court six times spending no less than five hours each day.

65. Capitol was forced to spend a considerable amount moving half of their pedicabs to a storage facility outside Manhattan to minimize their risk.

66. Plaintiff Bourama Camera quit driving pedicabs. It no longer made economic sense for him to continue working when he could be stopped at any time, under no reasonable or describable suspicion, but subjected to over an hour of probing inspection.

67. The inspections are no routine glance at the exterior of the pedicab, but rather are an intrusive search that includes looking under the passenger seats and overturning the pedicab to inspect the parts underneath.

68. The inspections often require that the driver discharge passengers without being paid, and on at least one occasion, resulted in a ticket being issued for improperly discharging passengers, when the passengers were instructed to leave by the officer.

69. During these long inspections, Plaintiff Camera could not earn money by working, and in a business with a narrow profit margin, such periods could make a wash of a day of work.

70. As a result of these actions, Plaintiff Camera was forced to seek other work after 8 years as a pedicab driver.

71. The harms to each of theses plaintiffs would not have occurred without the actions of the Defendants.

WHEREFORE, Plaintiff respectfully demands the Court issue a judgment declaring the City of New York's policy, practice, and custom of suspicionless stops and searches of pedicab drivers challenged herein is unconstitutional in that it violates the 4th and 14th Amendments of the United States Constitution, and that the regulations, as applied are arbitrary and capricious and should be struck down;

Issue an order enjoining the City of New York and Defendants from continuing the policy practice and custom of suspicionless stops;

Issue an order requiring the City of New York to observe reasonable, objective standards in enforcement of pedicab regulations;

Award Plaintiffs compensatory damages in an a fair and reasonable amount to be determined at trial;

Award Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Award Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988;

And award Plaintiffs such and other relief, as the Court deems just, reasonable, and proper.

Dated: New York, New York

July 5, 2016

T. Austin Brown, Esq.

*Attorney for the Plaintiff*

233 5th Avenue, #4A

New York, NY 10016

917-716-6537

TO: